IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  09-cv-02085-WJM-MJW

RANDAL ANKENEY,

Plaintiff,

v.

TIM CREANY,
KLENKE, Nurse Practitioner N.P., and
HIBBS, Nurse Practitioner N.P.,

Defendants.

---

**RECOMMENDATIONS ON
(1) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DOC. #10
(Docket No. 83);
(2) PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Docket No. 86);
(3) PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT
(Docket No. 87);
(4) PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF (Docket No. 100);
and
(5) PLAINTIFF'S MOTION FOR REINSTATEMENT OF COUNTS (Docket No. 104)**

---

**MICHAEL J. WATANABE
United States Magistrate Judge**

        This case is before the undersigned pursuant to an Order Referring Case issued

by District Judge Christine M. Arguello on November 12, 2009.  (Docket No. 15).  The

case was subsequently reassigned to District Judge William J. Martinez on March 8,

2011, upon his appointment to the court.  (Docket No. 93).

        The pro se incarcerated plaintiff, Randal Ankeney, alleged the following in his

Amended Prisoner Complaint brought pursuant to 42 U.S.C. § 1983.  (Docket No. 10).

He injured his left knee when he was incarcerated in the Colorado Department of

2

Corrections ("CDOC") in 2003 or 2004.  The CDOC denied care for the injury at that time, and he was told he did not need surgery or other treatment.  In 2008, he was re-incarcerated, and at admission, he complained to staff of increasing and chronic knee pain from the earlier injury.  He subsequently re-injured or aggravated the existing injury by slipping on standing water in a cell with a leaking toilet.  He repeatedly notified the CDOC of chronic pain that interfered with normal functions, made it difficult to sleep, and limited his mobility.  When he asked about whether he should exercise, he was told by medical staff that he should continue to exercise and that there was nothing seriously wrong with his knee.

Plaintiff has never had his knee examined by a knee specialist or by an orthopedic surgeon since his arrival at the correctional facility, nor has an MRI been performed.  He was told by an unspecified person that the denial of an examination by a surgeon or other specialist and denial of an MRI were due to budgetary and insurance reasons.

Plaintiff is now in constant pain from his knee injury.  He walks with a noticeable limp and usually has noticeable swelling in his left knee.  He is unable to perform routine movements and actions and is often unable to sleep due to the pain and constant discomfort.

Defendants were deliberately indifferent to his serious medical need.  He seeks a temporary and/or permanent injunction ordering defendants to perform an MRI on his left knee, have a knee surgeon or other specialist inspect and examine him and his medical records, and perform any and all treatment recommended by the surgeon, including any surgery and rehabilitation.  In addition, plaintiff seeks compensatory

3

damages for the damage to his knee, pain, and future medical care.  He also requests punitive damages.

In an Order issued on May 19, 2010 (Docket No. 41), Judge Arguello adopted and affirmed a report and recommendation issued by the undersigned (Docket No. 34) on defendants' motion to dismiss plaintiff's complaint (Docket No. 26) and plaintiff's motion for preliminary injunction (Docket No. 4).  Judge Arguello denied plaintiff's motion for preliminary injunction and granted in part and denied in part the motion to dismiss.  In particular, the motion to dismiss was granted "in that the claims against Defendants Hartley, DeCesaro, and John Doe are dismissed with prejudice for lack of personal participation and Plaintiff's Eighth Amendment claim concerning the failure to send him to a specialist and to have an MRI performed is also dismissed with prejudice for failure to state a claim."  (Docket No. 41 at 11).  In addition, the motion to dismiss was denied "with respect to Plaintiff's Eighth Amendment claim that his condition continued and worsened, but Defendants Dr. Creany, Nurse Practitioner Klenke, and Nurse Practitioner Hibbs were deliberately indifferent by refusing to even see or examine him."  (Docket No. 41 at 11).

Now before the court for a report and recommendation are:  (1) Defendants' Motion for Summary Judgment on Doc. #10 (Docket No. 83); (2) Plaintiff's Motion for Summary Judgment (Docket No. 86); (3) Plaintiff's Motion for Leave to Amend Complaint (Docket No. 87); (4) Plaintiff's Motion for Injunctive Relief (Docket No. 100); and (5) Plaintiff's Motion for Reinstatement of Counts (Docket No. 104).  The court has carefully reviewed these motions, the respective responses and replies, the court's file, and applicable Federal Rules of Civil Procedure.  The court now being fully informed

4

makes the following findings, conclusions of law, and recommendations.

Since the plaintiff is proceeding without counsel, his pleadings have been construed liberally and held to a less stringent standard than formal documents drafted by lawyers.  See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing Haines v. Kerner, 404 U.S. 519, 520-21 (1972)).  Therefore, "if the court can reasonably read the pleadings to state a claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements. . . . At the same time, . . . it is [not] the proper function of the district court to assume the role of advocate for the pro se litigant."  Id.

**MOTIONS FOR SUMMARY JUDGMENT**

Both the defendants and the plaintiff have moved for summary judgment. (Docket Nos. 83 and 86).  Rule 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial."  Robertson v. Board of County Comm'rs of the County of Morgan, 78 F. Supp.2d 1142, 1146 (D. Colo. 1999) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Mares v. ConAgra Poultry Co., 971 F.2d 492, 494 (10th Cir. 1992)).  "Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in the complaint,

but must respond with specific facts showing the existence of a genuine factual issue to be tried. . . .  These facts may be shown 'by any of the kinds of evidentiary materials listed in Rule 56 . . ., except the mere pleadings by themselves.'"  <u>Southway v. Central Bank of Nigeria</u>, 149 F. Supp.2d 1268, 1273 (D. Colo. 2001), <u>aff'd</u>, 328 F.3d 1267 (10th Cir. 2003).  However, "[i]n order to survive summary judgment, the content of the evidence that the nonmoving party points to must be *admissible*. . . .  The nonmoving party does not have to produce evidence in a form that would be admissible at trial, but '"the content or substance of the evidence must be admissible."' . . . **Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because 'a third party's description of a witness' supposed testimony is "not suitable grist for the summary judgment mill."'"**  <u>Adams v. American Guarantee & Liability Ins. Co.</u>, 233 F.3d 1242, 1246 (10th Cir. 2000) (emphasis added).  "[S]ufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein."  <u>Id.</u>

    "Summary judgment is also appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence presented in the motion and response."  <u>Southway</u>, 149 F. Supp.2d at 1273.  "The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. . . .  Unsupported allegations without 'any significant probative evidence tending to support the complaint' are insufficient . . . as are conclusory assertions that factual disputes exist."  <u>Id.</u>;

Robertson, 78 F. Supp.2d at 1146 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); quoting White v. York Int'l Corp., 45 F.3d 357, 360 (10th Cir. 1995)). "Evidence presented must be based on more than 'mere speculation, conjecture, or surmise' to defeat a motion for summary judgment." Southway, 149 F. Supp.2d at 1274. "Summary judgment should not enter if, viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party." Id. at 1273.

The court notes that the plaintiff took the depositions of the defendants and defendants' expert witness, and the bulk of the plaintiff's motion for summary judgment is supported by statements made by plaintiff as to what he purports some of that deposition testimony was in this case. He has not provided references to specific portions of the depositions transcripts or even the transcripts themselves, claiming he cannot afford to pay for the transcripts, which he states would cost him an additional $2,650.00. He asserts that "[t]o the extent Defendants dispute any characterization of their testimony of [sic] other statement of fact, Ankeney requests a hearing pursuant to F.R.C.P. [sic] 43(e) [presumably the new Rule 43(c)] and/or that the Defendants be required to provide the deposition transcripts, as those transcripts support all of the factual contentions described herein." (Docket No. 86 at 4).

This court finds, however, that It is the plaintiff's responsibility, and not the responsibility of the court or of the defendants, to obtain the deposition transcripts in order to support plaintiff's characterization of the testimony. A litigant "has no right to obtain documents [including transcripts] through discovery free of charge . . ., his status as an in forma pauperis litigant notwithstanding." Hawkinson v. Montoya, 2006 WL

7

1215397, at *2 (D. Colo. May 4, 2006).  See Patel v. United States, 399 Fed. Appx. 355,

359 (10th Cir. Oct. 19, 2010) (unpublished) ("the in forma pauperis statute makes no

provision for litigation expenses other than the reproduction of the record and [certain]

transcripts [not those applicable here]."); Gibson v. Campbell, 2010 WL 5158369, at *2

(D. Colo. Dec. 14, 2010) ("regardless of Plaintiff's in forma pauperis status, he is not

entitled to cost-free discovery in this action"); Tinsley v. Wright, 2010 WL 6422745, at *3

(D. S.C. Aug. 23, 2010) (report and recommendation adopted by district court) ("Civil

litigants, including pro se litigants, generally bear their own deposition costs."  Plaintiff

was denied funds to pay for depositions.); Wright v. United States, 948 F. Supp. 61, 62

(M.D. Fla. 1996) (collecting cases) ("the majority of the courts that have addressed the

issue of payment of court reporter fees and costs of transcription have found that

section 1915 does not give the trial court authority to direct the government to pay for

such costs.").

Defendants state they do not need these transcripts to support their motion or

response.   The court will not direct the defendants to bear the cost of the plaintiff's

discovery.  See Boring v. Kozakiewicz, 833 F.2d 468, 474 (3d Cir. 1987) ("By seeking

government funding in this case, [the pro se inmate is] in effect asking for better

treatment than [his] fellow citizens who have not been incarcerated but who have at

least equal claims for damages."); Brown v. Carr, 236 F.R.D. 311, 313 (S.D. Tex. 2006)

(inmate plaintiff proceeding in forma pauperis in a civil action may not expect the court

or defendants to pay fees associated with any depositions of defendants, including the

cost of the reporter's services as well as the cost for copies of the transcripts, merely

because he is an indigent inmate proceeding pro se); Baker v. Immanuel Medical

8

Center, 2007 WL 2914547, at *2 (D. Neb. Oct. 3, 2007) (same).  This court previously

denied the plaintiff's Motion for Hearing to Establish Facts Pursuant to Rule 56(d)(2)

(see Docket Nos. 99 and 123).

Consequently, the bulk of the plaintiff's motion for summary judgment, and even

much of his response to the defendants' motion for summary judgment, is based upon

hearsay.  The court, however, may not consider hearsay evidence in affidavits

submitted in support of, or in opposition to, summary judgment.  Young v. Dillon Cos.,

Inc., 468 F.3d 1243, 1252 (10th Cir. 2006).  Therefore, any statements made in plaintiff's

affidavit or motion papers which are based upon what was purportedly testified to during

the depositions or what plaintiff supposedly was told by non-party CDOC doctors will not

be considered by this court.  See Lobato v. Ford, 2007 WL 2593485, at *11 (D. Colo.

Sept. 5, 2007) ("The District Court is always free to disregard the inadmissible portions

of any affidavit tendered in conjunction with summary judgment briefing.").

Furthermore, the court notes that in his response to defendants' motion and in

his affidavit submitted with that response, the plaintiff "disputes" many of the facts

described in defendants' motion, including "that Defendants performed all of the tests

and examinations they claim; that they accurately recorded the true results; and that he

missed scheduled appointments."  (See Docket No. 111 at 6, ¶ 21). Plaintiff, however,

does not provide any support for his conclusory statements that he disputes such facts.

Self-serving affidavits, without support in the record, however, do not create a trial issue

of fact.  Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995).  See Stevens v.

Barnard, 512 F.2d 876, 879 (10th Cir. 1975) ("[G]eneralized, conclusory,

unsubstantiated, non-personal affidavits are insufficient to successfully oppose a motion

for summary judgment."); American Exp. Financial Advisors, Inc. v. Topel, 38 F.

Supp.2d 1233, 1242 (D. Colo. 1999) (noting that conclusory allegations not supported

by specific facts cannot defeat a properly supported motion for summary judgment).

In order to state an Eighth Amendment claim, "'a prisoner must allege acts or

omissions sufficiently harmful to evidence deliberate indifference to serious medical

needs.'" Self v. Crum, 439 F.3d 1227, 1230 (10th Cir.) (quoting Estelle v. Gamble, 429

U.S. 97, 106 (1976)), cert. denied, 549 U.S. 856 (2006).  "A prison official's deliberate

indifference to an inmate's serious medical needs is a violation of the Eighth

Amendment's prohibition against cruel and unusual punishment. . . .  The test for

constitutional liability of prison officials 'involves both an objective and a subjective

component.'"  Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005).  As the Tenth Circuit has

explained:

> to properly set forth an Eighth Amendment claim on which relief may be
> granted, [the prisoner] must set forth facts demonstrating [1] that his
> alleged medical need . . . was sufficiently serious to meet the objective
> element of the deliberate indifference test, *and* [2] that the Defendants'
> delay in meeting that need caused him substantial harm.  Finally, to meet
> the subjective element of the deliberate indifference test, [the prisoner]
> must allege facts supporting an inference [3] that Defendants knew about
> and disregarded a substantial risk of harm to his health or safety.

Oxendine v. Kaplan, 241 F.3d 1272, 1276-77 (10th Cir. 2001) (quotations omitted).

"A medical need is serious if it has been diagnosed by a doctor or is one that is

so obvious that even a lay person would easily recognize the necessity for a doctor's

attention."  Riddle v. Mondragon, 83 F.3d 1197, 1202 (10th Cir. 1996) (citation and

internal quotation omitted).  Although defendants argue that the plaintiff's knee condition

is not a serious medical need, for purposes of the two summary judgment motions, this

court will assume, without deciding, that plaintiff's purported knee condition is sufficiently serious to satisfy the objective inquiry.

As noted above, the only claim remaining is the plaintiff's Eighth Amendment claim that his condition continued and worsened, but Defendants Dr. Creany, Nurse Practitioner Klenke, and Nurse Practitioner Hibbs were deliberately indifferent by refusing to even see or examine him. This court finds that as asserted by the defendants, the plaintiff's medical records show that they each examined the plaintiff and provided treatment for a variety of ailments, including his knee, and plaintiff has provided no evidence in his summary judgment motion which shows that defendants refused to examine or treat him. The plaintiff's medical record (see Docket No. 83-1 and 108-1 at 16-49) shows that plaintiff received examinations, x-rays, and pain medication for his knee complaints and was examined and treated for several other conditions, i.e., sleep apnea, a possible inguinal hernia, left heel pain, and shoulder pain. While plaintiff points to one document which shows that his pain medication, Naprosyn, was not refilled on July 21, 2010, that same document provides the medical reason for the denial, namely, "time to cycle off for safety reasons. Work on physical therapy exercises for long term traction and pain control." (Docket No. 111-4 at 2).

Specifically, particularly with regard to plaintiff's knee, the medical record shows the following. Plaintiff first injured his left knee while playing softball on June 1, 2003, while in the custody of the CDOC. (Docket No. 83-1 at 16). The following day, he was seen by nursing staff, and it was recommended that he have no athletic activities for several days, use ice, elevate his knee, and notify medical staff if there was no improvement in three days. (Docket No. 83-1 at 16). Almost one year later, on May 18,

11

2004, he was evaluated by an orthopedist who noted an MRI would not be helpful, diagnosed medial meniscus tear, and recommended arthroscopy surgery.  (Docket No. 83-1 at 17).  It is noted in the medical record on June 10, 2004, however, that the request for a knee arthroscopy was denied by insurance provided Colorado Access as medically unnecessary because his condition was not expected to deteriorate prior to imminent parole.  (Docket No. 83-1 at 18).  During an evaluation for complaint of knee pain on June 20, 2004, the provider noted "Left knee slightly swollen.  Normal ambulation noted.  Patient states that pain occurs when he twists or turns his knee while running.  Instructed patient on measures to avoid symptoms to include no running. Recommended patient to follow up with an orth. specialist for a second opinion after discharged from DOC in 60 days."  (Docket No. 83-1 at 21).  Plaintiff admits that he did not seek or receive treatment for his knee injury knee after his release from CDOC custody.  (See Docket No. 108-2 at 2).

Plaintiff was subsequently returned to CDOC custody, and during the intake screening on January 9, 2008, the nurse marked off on a form that there was no observed or reported mobility limitations, and noted that plaintiff ambulated satisfactorily.  (Docket No. 83-1 at 22).  That day plaintiff completed a self-reported medical history form, and in the section for current medical problems wrote that he had a "torn meniscus/ACL in knees," a deviated septum requiring surgery, and a current cold/flu.  (Docket No. 83-1 at 23).  In response to the question of whether he had joint pain or back injury, he marked "no."  (Docket No. 83-1 at 23).  The following day, plaintiff had an intake physical examination.  At that time, it was documented that he reported hurting his left knee and was out on the streets for four years but did not seek

12

medical care for his knee during that time but did see a doctor at an Ear, Nose, and Throat Center for a deviated nasal septum.  The examiner reported that plaintiff was "[a]ble to get on/off exam table [without] difficulty.  Able to squat [without] difficulty. [Left] knee positive anterior drawer test [with] laxity noted.  Steady gait."  (Docket No. 83-1 at 24).

Plaintiff was transferred to Fremont Correctional Facility ["FCF"] on February 29, 2008, at which time when he was asked if he was currently being treated for a medical condition, his answer was, "sleep apnea."  (Docket No. 83-1 at 25).  He responded "no" to the questions of whether he was currently on any medications and whether he currently had a medical, dental, or mental health complaint.  (Docket No. 83-1 at 25).

On March 19, 2008, plaintiff was examined by NP Klenke based on plaintiff's sleep apnea, at which time plaintiff also complained of knee pain, stating he slipped and fell, and his left knee hurt.  Klenke reported, "No effusion present today; comparatively symmetrical to other knee; drawer test negative."  Ibuprofen was prescribed.  (Docket No. 83-1 at 26).

On May 5, 2009, Klenke evaluated plaintiff on his complaint that "My knee hurts. I hurt it sometime ago, but it sill [sic] bothers me.  It cracks and pops when I bend it. Can I have a bottom bunk?"  (Docket No. 83-1 at 27).  At that time Klenke reported that "[k]nees appear symmetrical.  No effusion.  Crepitus present in left knee with bending. No drawer laxity noted today; no patellar instability; lachman's test & drawer test negative.  c/o pain in lateral, inferior, and medial areas of knee."  (Docket No. 83-1 at 27).  Klenke requested an x-ray of the knee.  (Docket No. 83-1 at 27).  The assessment notes "knee exam nonremarkable xcept presence of crepitus; f/u per xray findings.

13

Requests for lower bunk not indicated by criteria.  Supposed injury to left meniscus in 2004........never repaired per patient."  (Docket No. 83-1 at 27).

Two days later, plaintiff filed a Step I grievance, asserting, "I am certain there is tissue damage in my left knee and that it was aggravated by my slip on standing water while in cellhouse 5 (with a leaking toilet). I've seen medical twice and am apparently scheduled for an x-ray, which does not detect tissue damage."  (Docket No. 83-1 at 28). Plaintiff wanted an opinion as to what types of exercise are okay, stating, "My knee is better when I exercise (overall), but I don't want to aggravate the injury."  (Docket No. at 83-1 at 28).  Plaintiff requested an MRI and/or an examination by a surgeon, corrective surgery, rehabilitation, a bottom bunk restriction at least until after surgery, and a knee wrap or two.  (Docket No. 83-1 at 28).  The grievance was denied by Klenke because the requested remedies were "not clinically indicated by criteria."  (Docket No. 83-1 at 28).

An x-ray report of the plaintiff's left knee dated May 13, 2008, states, "mild narrowing of the medial joint space of the left knee on the standing views.  No patellar subluxation and no chondrocalcinosis or joint effusion.  IMPRESSION: Narrowing of the medial joint space of the left knee with no acute fractures demonstrated."  (Docket No. 83-1 at 29).

The following week, on May 20, 2008, plaintiff filed a Step II grievance (the content of which is not legible on the copy supplied to the court).  (Docket No. 83-1 at 30).  That grievance was denied by defendant Dr. Creany, who stated, "Your knee exam shows no findings to suggest that further testing (MRI, etc) is medically necessary.  You do not have medical necessity for a low bunk restriction.  Kite for an appt if you want to

14

review exercises or be evaluated for an ACE wrap." (Docket No. 83-1 at 30).

The record documents plaintiff failed to show for two appointments with Klenke on July 28 and August 12, 2008 (Docket No. 83-1 at 31 and 32), but plaintiff denies failing to appear for any appointments. (See Docket No. 112-2 at 2, ¶ 4).

Klenke evaluated plaintiff for another complaint (possible inguinal hernia after lifting weights) on September 4, 2008, and Klenke requested a consult with a surgeon. (Docket No. 83-1 at 33). Dr. Creany evaluated plaintiff for that complaint and that of left heel pain later that month on September 22, noting that plaintiff "reports this has been ongoing for a few weeks. He c/o early am pain in left heel and goes jogging most ams. He denies acute trauma. This gets better as the day goes on and then is ok later in the day." (Docket No. 83-1 at 34). The doctor noted that "pt already has a kite in for his knee. This still needs to be scheduled if not done already (not enough time today)." (Docket No. 83-1 at 34).

Plaintiff was evaluated for knee pain by Klenke nine days later on October 1, 2008, with plaintiff reporting, "My knee is bothering me. It hurts mostly in the morning. I haven't fallen or anything recently. I think that xray showed I had some narrowing in the compartment place." (Docket No. 83-1 at 35). Klenke reported, "No antalgic gait. Arises/descends exam table w/o much effort. Knees comparatively symmetrical; no effusion b/l. Complains of pain underneath the left patella area. Lachmann's/drawer test negative. Mild medial collateral tenderness w/ knee extension." (Docket No. 83-1 at 35). The assessment stated, "Kneepain [sic] ..... mild NSAID; instructed to take w/food and on a limited basis." (Docket No. 83-1 at 35). According to defendants' expert, Dr. Paula J. Frantz, "[t]his exam was unremarkable and did not suggest

pathology other than arthritis." (Docket No. 83-1 at 8, ¶ 31).

Later that month, on October 28, 2008, Klenke saw plaintiff for a complaint of shoulder pain after lifting weights five weeks before. (Docket No. 83-1 at 36).

Plaintiff was next seen by NP Hibbs on January 7, 2009, for a complaint of allergies, a painful left small toe rubbing an outer boot, and continued problems "with Left knee locking up at times, especially since is a runner. Does have pain in the knee." Hibbs noted the May 2008 x-ray results and that plaintiff "agrees at this time to continue current pain management and if situation continues to be a problem, will put in for an MRI."(Docket No. at 83-1 at 37). The next day plaintiff was seen by a surgeon for the possible inguinal hernia, who determined plaintiff did not have a hernia. (See Docket No. 83-1 at 38).

On January 31, 2009, plaintiff submitted a kite to be seen by a P.A. or N.P., explaining the need for such as "(1) I am having issues with frequent & intermittant [sic] urination (and control) (2) my knee continues to severely ache. I believe there is tissue damage." The response was, "as for your knee we will need to continue with the conservative treatment on Naprosyn for now. We are not getting approval at this time for outside evaluation on non-emergent requests. I'm sorry. If frequent urination is an issue you can kit to be seen, if you wish." (Docket No. 111-5 at 2).

The following month, on February 5, 2009, Hibbs reported that plaintiff had submitted a kite indicating that "knee still problem think major damage. Urination urgency and frequency." Hibbs reviewed the x-rays and documented "5/13/08 Mild narrowing noted[.] will write back need to treat knee conservatively yet. If urgency major issue to kite to be seen." (Docket No. 83-1 at 39).

16

The next month, on March 11, 2009, plaintiff submitted a kite for and received a Naprosyn refill (as well as a refill for allergy medication) from Hibbs.  (Docket No. at 83-1 at 40).

An x-ray report of the plaintiff's left knee dated April 16, 2009, states, "Multiple views of the left knee demonstrate moderate degenerative change in the medial femorotibial compartment and mild degnerative change in the lateral femorotibial compartment.  The patellofemoral area has a normal appearance.  No joint effusion is seen.  IMPRESSION: Degenerative changes in the left knee as described."  (Docket No. 83-1 at 43).

On May 27, 2009, plaintiff was seen by Hibbs for "Left knee pain, bothering ongoing, but much worse again in last month.  Hurts to get up from sitting, can't get comfortable at night.  Using extra blanket to support knee.  Naprosyn helps some.  Taking glucosamine 3 tablets a day."  (Docket No. 83-1 at 42).  Hibbs reported, "On exam Crepitus felt, with movement of knee in bending motion, Drawer negative, but with exam has pain over medial ligament, with radiation down into upper leg. . . .  Will increase dose of naprosyn and recheck x ray of knee."  (Docket No. 83-1 at 42).  An addendum written later that day stated, "Saw inmate as coming out of work area in gym shorts, shoes, or visible impairment as moving, limp or favoring of the left knee.  Was talking, smiling and laughing with another inmate.  Inmate did notacknowledge [sic] provider not sure inmate even saw provider. . . .  Date observed coming out of the gym was date seen in clinic for knee 4/13/09 around 4 pm in afternoon."  (Docket No. 83-1 at 42).  The written assessment indicated, "not [sic] xray 5/08, showed narrowing of joint.  Will recheck xray now to see if changes.  May need to refer to orthopedic for more

indepth evaluation.  Also will increase Naprosyn does to 500 mg bid."  (Docket No. 83-1

at 42).

Plaintiff was seen for other conditions in May 2009 (lump on his side) (Docket

No. 83-1 at 44), August 2009 (foot pain) (Docket No. 83-1 at 45), and November 2009

(testicular lump) (Docket No. 83-1 at 47), and put in a kite on January 28, 2010, for a

refill of Naprosyn, which was refilled (Docket No. 83-1 at 48).  Plaintiff submitted a kite

for a refill of Naprosyn on July 21, 2010, but it was denied with the response "time to

cycle off for safety reasons.  Work on physical therapy exercises for long term traction

and pain control."  (Docket No. 111-4 at 2).

Defendants' expert, Paula J. Frantz, M.D., the Chief Medical Officer for the

CDOC, opined in her affidavit:

> 45.  Ankeney has a history of ongoing left knee pain.  He has had
> multiple exams by DOC providers and one exam by an orthopedic
> specialist in 2004.  The orthopedist recommended arthroscopic surgery for
> a possible torn medial meniscus; however this was not performed due to
> Ankeney's imminent parole.  Ankeney was advised to follow-up with an
> orthopedic specialist after his parole, however in the four year period
> between incarcerations, Ankeney did not pursue orthopedic care of his
> knee.  He did see at least one other specialist during that time period for a
> deviated nasal septum.  This indicates Ankeney did have resources
> available for medical care while not incarcerated, and chose to not pursue
> orthopedic care.
>
> 46.  The orthopedist in 2004 indicated that an MRI would be of
> doubtful benefit.  When a meniscus has a tear, symptoms of pain and
> locking will occur when the torn fragment gets folded back on the
> meniscus or gets "stuck" out of place.  With conservative care, the
> menisceal cartilage can scar down and alleviate the problems associated
> with the tear without requiring surgery.
>
> 47.  Even though Ankeney did not seek orthopedic
> care during the time he was not incarcerated, once Ankeney was re-
> incarcerated in 2008 he almost immediately began to demand an MRI or
> an orthopedic evaluation for his knee.

48.  The DOC providers documented a number of exams that had minimal findings except for crepitus.  Crepitance is the finding of popping and cracking of the knee with extension and flexion.  It is very common and is usually associated with irregularities or fraying on the surface of the cartilage on the posterior aspect of patella.  Arthroscopic surgery can be done to shave the back of the cartilage, however this is a temporary fix and the irregularities will re-occur.  In most cases crepitance is best managed by judicious use of non-steroidal anti-inflammatory drugs (NSAIDS) such as Naprosyn, and maintaining physical activity to maintain muscular strength.

49.  The providers also x-rayed the left knee in 2008 and again in 2009.  Both x-rays show the presence of joint space narrowing with the suggestion that the 2009 films demonstrated more prominent degenerative joint disease than what was present in 2008.  Joint space narrowing of the knee on x-ray is highly indicative of degenerative arthritis, also know [sic] as osteoarthritis.  Many times the cause of this type of arthritis is unknown.  In some instances this type of arthritis may be the inevitable result of trauma or of repetitive small injuries.

50.  In some studies, degenerative joint disease is related to some sports, yet many questions remain about process.  It is not understood why some injuries or circumstances lead to arthritis in some individuals, but not in others.  A torn meniscus or torn ACL is associated with degenerative joint disease, however surgical intervention does not prevent or reduce the risk of osteoarthritis.  In addition, the degree of changes on x-ray do not necessarily correlate with symptoms of pain.

51.  The symptoms described by Ankeney are very typical of osteoarthritis.  Pain in the knee, stiffness of the knee, and increased symptoms in the morning are consistent with osteoarthritis.  Movement will help the stiffness, but some activities may exacerbate the pain. Crepitus is a frequent finding upon physical exam.  It is impossible to predict the extent of progression of osteoarthritis for any particular patient.  Some patients may have minimal progression, while others will progress to significant mobility limitations.

52.  The treatment for degenerative arthritis is use of non-steroidal anti-inflammatory drugs (NSAID) such as Naprosyn and maintenance of physical activity and muscle strength.  Most individuals will do well with this treatment regimen.  According to UpToDate, Clinical Manifestations of Osteoarthritis, accessed Jan 4, 2011, MRI is usually not indicated for individuals with symptoms and/or x-ray findings that are consistent with osteoarthritis.  Arthroscopic surgery for degenerative joint disease of the

knee is controversial at best.

53.   According to UpToDate, Surgical Therapy of Osteoarthritis, accessed Jan 4, 2011, joint irrigation has been shown to have no benefit compared to sham surgery.  Debridement (smoothing of the cartilage) showed no difference in outcome compared to conservative treatment with activity, muscle strengthening, and NSAID medication.  In those patients who experience an improvement in pain pattern after arthroscopy surgery, the relief is temporary.  In a small number of patients, the pain will progress to the point that it substantially limits function.

54.   At that point, a total joint replacement may be recommended. This treatment option would not be considered until the patient was significantly limited in function.  The providers document repeatedly Ankeney is maintaining his physical activity and does not appear to have significant functional limitation.  It would be inappropriate to consider a knee replacement at this time.  Given the presence of the degenerative changes, it is highly unlikely that arthroscopic surgery at this time would alleviate Ankeney's knee pain.  Ankeney even indicated in his own grievance that his knee is better if he exercises.

55.   Ankeney's medical record reflects that NP Klenke, NP Hibbs, and Dr. Creany have evaluated this Ankeney multiple times and continue to see him for his complaints.  There is no evidence that these providers have refused to see Ankeney for his complain of knee pain.

56.   I was able to review the kite log for the period ending August 5, 2010.  I found two kites submitted for knee pain on April 13 and August 13, 2009.  Ankeney was evaluated by a provider for each of those kites. . . .

57.   Ankeney has submitted multiple kites for numerous other complaints and the providers have responded appropriately to each kite. In addition, the providers have referred Ankeney to other specialists for other complaints (surgeon, sleep study) which indicates that the providers requested specialty consultation when it is clinically indicated.

58.   It is my professional opinion that the care provided by Dr. Creany, NP Klenke, and NP Hibbs has been appropriate for Ankeney's diagnosis of knee pain.

(Docket No. 83-1 at 10-14).

Plaintiff's expert, his brother Geoffrey Ankeney, M.D., who completed his

residency in Family Practice, has not personally examined plaintiff, has spoken to

plaintiff about the case and his symptoms, and has reviewed plaintiff's CDOC medical

file and Dr. Frantz's affidavit, states in his affidavit:

> 3.  In this case, an orthopedic specialist has diagnosed a serious injury requiring surgery.  I would expect any subsequent exam or treatment to include the knowledge of this diagnosis from a review of the medical file and from interviewing the patient.

> 4.  An important part of any examination is a thorough history, which includes taking an oral history from the patient and reviewing his medical file.  The later knee examinations fail to mention previous records, suggesting that a full review was not completed.

> 5.  It is unlikely that any primary care provider could examine or treat Randy, and remain ignorant of that previous diagnosis.

> 6.  Dr. Frantz opined that Randy suffers from osteoarthritis.  While likely true, Randy is seeking care for surgically-correctable knee pathology diagnosed by a fully qualified specialist.

> 7.  Dr. Frantz suggests that osteoarthritis is causative etiology for Randy's knee pain.  However, this opinion is contrary to a specialist's diagnosis and recommendation.  Furthermore, because appropriate work-up never occurred, there is no evidence available to support Dr. Frantz's opinion.

> 8.  Serial radiographs of Randy's knee suggest progressive pathology that at one point was minimal, but has worsened over time. There is medical evidence to support the idea that osteoarthritis can develop in an environment where surgical correction is warranted but does not occur.  While it is common practice to observe meniscal tears for non-surgical resolution, a specialist determined that the extent of his injury warranted procedural intervention.  Approval was not given for this procedure- and continues to be denied while progressive and irreversible knee pathology continues to develop.

> 9.  Dr. Frantz asserts that surgical remedy is controversial or not helpful.  However, a menesctomy, as ordered by Dr. Pohlman, is a well-established intervention for this type of injury.  While there are non-surgical approaches [for] such injuries, once it is determined by a specialist to need surgical correction, it is imperative that this procedure occur or progressive knee pathology can result.  Furthermore, the medical

opinion of primary care is valid in a case like this unless there is a competing opinion given by a specialist. Because a specialist has advised surgery, Dr. Frantz's dissonant opinion is not credible.

10. Based on Randy's repeated complaints while at Fremont, standard care would entail a referral for an orthopedic consult and an MRI exam. This is exactly what was done when Randy was at Sterling.

11. In her clinical notes of January 7, 2009, N.P. Hibbs noted that an MRI would be ordered if problems persisted. Randy's problems persisted, but she never ordered the test. Her handwritten note of February 5, 2009 states that Randy was denied needed care because of budgetary concerns or limitations.

12. It is my professional opinion that the record shows that Ankeney has a serious medical need that was diagnosed but never treated. I am concerned that osteoarthritis developed because of the lack of surgical care. I do not see any reasonable evidence to support the idea that Randy suffers EXCLUSIVELY from osteoarthritis, because a thorough work-up was never completed. The medical file indicates that the standard of care was disregarded on more than one occasion in this case.

(Docket No. 111-3 at 2-3).

This court finds that the plaintiff has failed to satisfy the subjective prong requiring that he show that the defendants knew of and disregarded a substantial risk of harm to his health or safety. The medical record provided by both the defendants and the plaintiff shows that the defendants provided the plaintiff with examinations, x-rays, and pain relief as they determined was clinically indicated. There is no evidence that they refused to see or treat him for his knee complaints. This is a case of a disagreement with the assessments, diagnoses, and treatments provided by three medical providers, which does not state a claim of constitutional magnitude.

Even a disagreement between experts does not give rise to an Eighth Amendment claim of deliberate indifference. See Supre v. Ricketts, 792 F.2d 958, 962-63 (10th Cir. 1986). A medical difference of opinion is not actionable under the Eighth

Amendment.  Fitzgerald v. Corrections Corp. of Am., 403 F.3d 1134, 1142 (10th Cir.

2005).  Defendants' refusal to provide a particular course of treatment sought by the

plaintiff does not constitute deliberate indifference.  See Perkins v. Kansas Dep't of

Corr., 165 F.3d 803, 811 (10th Cir. 1999) ("a prisoner who merely disagrees with a

diagnosis or a prescribed course of treatment does not state a constitutional violation").

In addition, a prisoner's contention that he was denied treatment by a specialist is

generally insufficient to establish a constitutional violation.  Duffield v. Jackson, 545

F.3d 1234, 1239 (10th Cir. 2008) ("The decision that a patient's condition requires a

specialist is a decision about the patient's course of treatment, and 'negligent diagnosis

or treatment of a medical condition do[es] not constitute a medical wrong under the

Eighth Amendment."); Self v. Crum, 439 F.3d at 1232 ("[T]he subjective component is

not satisfied, absent an extraordinary degree of neglect, where a doctor merely

exercises his considered medical judgment.  Matters that traditionally fall within the

scope of medical judgment are such decisions as to whether to consult a specialist or

undertake additional medical testing."); Ledoux v. Davies, 961 F.2d 1536, 1537 (10th Cir.

1992).  Also, a medical providers' considered decision not to order an MRI, or like

measures, does not violate a prisoner's constitutional rights.  See Estelle v. Gamble,

429 U.S. at 107 (1976) ("[T]he question whether an X-ray or additional diagnostic

techniques or forms of treatment is indicated is a classic example of a matter for

medical judgment.  A medical decision not to order an X-ray, or like measures, does not

represent cruel and unusual punishment.  At most it is medical malpractice and as such

the proper forum is the state court.").

        It is thus recommended that defendants' motion for summary judgment be

granted on the sole claim remaining in this action and that plaintiff's motion for the same

relief be denied.

## MOTION TO REINSTITUTE CLAIMS

Plaintiff moves for reinstatement of counts (Docket No. 104) pursuant to Fed. R.

Civ. P. 54(b).  Plaintiff seeks reinstatement of his claims against the three defendants

for failing to send him to a specialist and to have an MRI performed, asserting that

defendants' own discovery has shown that this is not just a disagreement with

diagnosis, noting that such treatment has already been prescribed.  Defendants

respond that Rule 54 is not a vehicle by which a litigant can seek to have a previous

order revised or reconsidered.  Defendants contend that while unclear,  it appears that

plaintiff may be seeking to have the court to reconsider its recommendation and order

as a result of "new" information regarding the early diagnosis by two CDOC doctors that

plaintiff has a tear of his meniscus and a possible ACL tear.  If that is the case, then

defendants assert that it is possible that Rule 60 applies, but defendants assert that

plaintiff's argument fails as he can show no excusable neglect, mistake, or fraud that

requires reconsideration.  In addition, defendants contend that plaintiff's "newly

discovered evidence" was located in the plaintiff's medical file and plaintiff's memory,

both of which were easily accessible with plaintiff's reasonable diligence and which

could have been included in the allegations in plaintiff's complaint.  Furthermore, they

assert that the plaintiff's legal arguments are without merit.

This court recommends that the plaintiff's motion be denied.  As the court found

above, this is a case where there is just a disagreement with current diagnosis and

treatment.  Also, as the record shows from intake evaluations done when plaintiff was

re-incarcerated, he knew about the prior DOC doctor's opinions and recommendations. In addition, plaintiff could have readily obtained his CDOC medical record through the usual administrative procedure at any time.  The actual reports of those doctor's opinions are thus not new evidence which should form the basis of a reinstatement of plaintiff's claims.

## MOTION TO AMEND THE COMPLAINT

The deadline for amendment of pleadings was August 20, 2010.  (See Docket Nos. 49 and 51 at 6).  Almost six months after that deadline, on February 16, 2011, plaintiff filed a motion for leave to amend his complaint (Docket No. 87) to "add the claim of negligence and/or malpractice to his Complaint against Defendants Creany, Kelenk, and Hibbs."  (Docket No. 87 at 2, ¶ 7).

Defendants oppose this motion to amend on the ground that such request is untimely, citing Minter v. Prime Equip. Co., 451 F.3d 1196, 1206 (10th Cir. 2006) ("Courts will properly deny a motion to amend when it appears that the plaintiff is using Rule 15 to make the complaint 'a moving target,' . . .  to 'salvage a lost case by untimely suggestion of new theories of recovery,' . . . [or] to present 'theories seriatim' in an effort to avoid dismissal . . . ."); Pallottino v. City of Rio Rancho, 31 F.3d 1023, 1027 (10th Cir. 1994) ("We have often found untimeliness alone a sufficient reason to deny leave to amend, 'especially when the party filing the motion has no adequate explanation for the delay.'").  (Docket No. 109 at 3).  Defendants note that they filed a motion to dismiss in January 2010, and that in May 2010 Judge Arguello adopted this court's recommendation that the only remaining issue be whether the defendants refused to see or examine the plaintiff as his condition worsened, in violation of the Eighth

25

Amendment.  Then, approximately nine months later, plaintiff has decided to try to

amend in order to present whole new arguments and claims that are completely

unrelated to the only remaining issue.  Defendants assert that "Plaintiff's request is

nothing more than a thinly veiled attempt to circumvent the Orders and

recommendations in this matter and seek to add new claims in an effort to make his

complaint a 'moving target.'" (Docket No. 109 at 3-4, ¶ 9).  Furthermore, defendants

contend that plaintiff's amendment would cause undue prejudice on defendants as they

wil lbe required to spend the time and financing needed to file another motion to dismiss

and possibly perform additional discovery, which would be in addition to the time and

money defendants already exhausted in defending depositions plaintiff has been

unwilling to facilitate transcription by the court reporting agency.  In addition, defendants

argue that plaintiff's proposed amendment would be futile because, noting that plaintiff

has failed to attach the proposed amended complaint, plaintiff has failed to show that he

has satisfied the Notice requirements under the Colorado Governmental Immunity Act

("CGIA") or the Certificate of Review requirement of § 13-20-602, C.R.S.  Defendants

note that plaintiff's compliance with these procedural requirements is jurisdictional in

nature and must be satisfied within the required time frame in order to prevent

dismissal.

        In his reply, plaintiff claims defendants cite no specific examples of prejudice that

will result from allowing the additional claims, asserting that "[t]he claims are not

catching Defendants unaware, and can be no great surprise, as Defendants' own

discovery and deposition answers are what led to the discovery of facts supporting the

claims."  (Docket No. 124 at 2, ¶ 3).  He also asserts that his injury is "continuous and

26

ongoing," that he only recently learned of the facts supporting the claims, and that he

has met the statutory notice requirements and/or has time yet to do so.

The court need not address the defendants' futility argument because this

court agrees with the defendants that the plaintiff's motion to amend is untimely and

should be denied. Since the plaintiff's motion to amend was made after the deadline

for amendment of pleadings, the following analysis should be applied in deciding

whether to allow the amendments:

> Where, as here, a motion to amend the pleadings . . . is filed after the
> scheduling order deadline, a "two-step analysis" is required. Once a
> scheduling order's deadline for amendment has passed, a movant must
> first demonstrate to the court that it has "good cause" for seeking
> modification of the scheduling deadline under Rule 16(b). If the movant
> satisfies Rule 16(b)'s "good cause" standard, it must then pass the
> requirements for amendment under Rule 15(a) . . . .
>
> Rule 16(b)'s "good cause" standard is much different than the more lenient
> standard contained in Rule 15(a). Rule 16(b) does not focus on the bad
> faith of the movant, or the prejudice to the opposing party. Rather, it
> focuses on the diligence of the party seeking leave to modify the
> scheduling order to permit the proposed amendment. Properly construed,
> "good cause" means that the scheduling deadlines cannot be met despite
> a party's diligent efforts. In other words, this court may "modify the
> schedule on a showing of good cause if [the deadline] cannot be met
> despite the diligence of the party seeking the extension." Carelessness is
> not compatible with a finding of diligence and offers no reason for a grant
> of relief.

Pumpco, Inc. v. Schenker Int'l, Inc., 204 F.R.D. 667, 668 (D. Colo. 2001) (quotations

and citations omitted). The second step is consideration of whether the plaintiff has

satisfied the standard for amendment of pleadings required under Fed. R. Civ. P. 15(a):

"Rule 15(a) provides that leave to amend 'shall be freely given when justice so requires.'

Refusing leave to amend is generally only justified upon a showing of undue delay,

undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure

deficiencies by amendments previously allowed, or futility of amendment." Id. at 669 (citation omitted).

This court finds that the plaintiff has not satisfied the first step in the analysis as he has not established good cause to extend the deadline within which he may seek leave to amend the complaint.  In his motion, plaintiff states:

[].    On December 29, 2010 and January 6, 2011, Ankeney deposed the three Defendants and their designated expert, Dr. Paula Frantz.

[].    At those depositions, Defendants Creany, Klenke, and Hibbs admitted to several errors in treating Ankeney that support an added count of negligence and/or malpractice.  Those admissions include missing important information contained in Ankeney's medical file when diagnosing and treating him, failing to properly examine Ankeney, and failing to properly evaluate and/or follow up on procedures.

[].    Defendants admitted that Ankeney has a serious injury that may require a knee replacement.  Dr. Creany described Ankeney's injury as so severe that he should never run again.  To the extent that the degeneration of Ankeney's conditions was caused by negligence or malpractice rather than deliberate indifference on the part of the Defendants, they should be held accountable.

[].    Plaintiff Ankeney is incarcerated, pro se, and proceeding in forma pauperis.  He only learned of these facts recently, after conducting depositions at great expense to him and his family.  He should be given latitude in Amending his pleading in the interest of justice.

28

      [].    Allowing Ankeney to Amend his Complaint will not prejudice the

              Defendants, whose admitted conduct supports the added claims.  No

              additional discovery will be necessary.  The only consequence will be to

              prevent Defendants from arguing negligence or malpractice as a way to

              avoid a claim of deliberate indifference.

(Docket No. 87 at 1-2, ¶¶ 2-6).  Once again, plaintiff is supporting his motion with

hearsay as he has not provided the court with the transcripts of the depositions

referenced in plaintiff's motion.  Even if that were not the case, this court finds that

plaintiff could very well have moved to amend his pleading to add a malpractice action

even without obtaining testimony from the defendants and/or their expert witness and

could have readily plead such a claim before the deadline to do so expired.  The court

agrees with the defendants that plaintiff is using Rule 15 to make the complaint a

moving target, to salvage a lost case by untimely suggestion of a new theory in an effort

to avoid dismissal.  As an aside, the court also notes that defendants correctly point out

that plaintiff did not tender a proposed amended complaint.  In addition, if the

recommendation above with regard to the summary judgment motions is accepted, the

plaintiff's federal claim pursuant to § 1983 would be dismissed, and this court would

thus recommend that the complaint not be allowed to be amended so as to only state

supplemental state law claims.

**MOTION FOR INJUNCTIVE RELIEF**

      Plaintiff also moves for injunctive relief (Docket No. 100), "specifically that he be

referred to a qualified physician specializing in orthopedic injuries, and that all tests,

exams, or procedures ordered by that physician be followed."  (Docket No. 100 at 3).  If

29

the recommendation above concerning the summary judgment motions is accepted,

then this motion would be moot.  Even if that recommendation is not accepted, for the

reasons stated in this court's report and recommendation on plaintiff's previous motion

for the same relief (see Docket No. 34), which was accepted by Judge Arguello (see

Docket No. 41), this court once again recommends that plaintiff's motion for injunctive

relief be denied.  Plaintiff has offered nothing new which would warrant granting the

relief sought.

     **WHEREFORE,** for the foregoing reasons, it is hereby

     **RECOMMENDED** that the Defendants' Motion for Summary Judgment on Doc.

#10 **(Docket No. 83)** be **GRANTED**.  It is further

     **RECOMMENDED** that the Plaintiff's Motion for Summary Judgment **(Docket No.**

**86)** be **DENIED**.  It is further

     **RECOMMENDED** that the Plaintiff's Motion for Leave to Amend Complaint

**(Docket No. 87)** be **DENIED**.  It is further

     **RECOMMENDED** that the Plaintiff's Motion for Injunctive Relief **(Docket No.**

**100)** be **DENIED**.  It is further

     **RECOMMENDED** that the Plaintiff's Motion for Reinstatement of Counts **(Docket**

**No. 104)** be **DENIED**.

     **NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2),**

**the parties have fourteen (14) days after service of this recommendation to serve**

**and file specific written objections to the above recommendation with the District**

**Judge assigned to the case.  A party may respond to another party's objections**

within fourteen (14) days after being served with a copy.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions. <u>Makin v. Colorado Dep't of Corrections</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir. 1996).


Date:  June 30, 2011                    <u>s/ Michael J. Watanabe</u>
         Denver, Colorado               Michael J. Watanabe
                                        United States Magistrate Judge